Filed 1/13/26  Maas v. McKinnon Broadcasting Co. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| SANDRA MAAS,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>MCKINNON BROADCASTING COMPANY,<br><br>    Defendant and Appellant. | D082767<br><br><br>(Super. Ct. No.  37-2019-00032336-CU-OE-CTL) |
| SANDRA MAAS,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MCKINNON BROADCASTING COMPANY,<br><br>    Defendant and Appellant. | D084334 |

CONSOLIDATED APPEALS from a judgment and orders of the Superior Court of San Diego County, Ronald F. Frazier, Judge. Affirmed and remanded with instructions.

Fitzgerald Knaier, Kenneth M. Fitzgerald and Kyle W. Hoffman for Defendant and Appellant.

Gruenberg Law, Joshua D. Gruenberg, Joshua P. Pang, and Pamela Vallero; William Iagmin and Jon R. Williams for Plaintiff, Appellant and Respondent.

## I.   INTRODUCTION

We consider several appeals originating in a discrimination suit brought by Sandra Maas against her former employer, McKinnon Broadcasting Company (MBC). Maas co-anchored a local news program from 2010 through 2018, during which time MBC paid her significantly less than her male co-anchor. Maas sued MBC, claiming MBC violated anti-discrimination statutes and declined to renew her contract in retaliation for her complaint about the gendered pay disparity. After a lengthy trial, the jury found in Maas's favor. MBC challenges the verdict on various grounds, none of which we find persuasive. We affirm the judgment.

MBC and Maas have also each appealed the trial court's award of attorney fees to Maas. Finding no abuse of discretion, we decline to disturb the court's award.

Finally, MBC has appealed a postjudgment order in which the trial court calculated interest and determined it would retain a portion of MBC's postjudgment deposit pending Maas's appeal of the attorney fee award. We find the trial court's calculation of interest was incorrect. On remand, the trial court shall recalculate the interest owed on the judgment in accordance with this opinion. Because we have now resolved Maas's appeal, the basis

2

for the trial court's retention of the deposit no longer exists. The question whether it was proper for the court to retain the deposit pending appeal is therefore moot.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Maas's Employment at KUSI

KUSI-TV is a television station located in San Diego. MBC owned the station during the events relevant to this matter. MBC hired Maas in 2004 to anchor KUSI's morning news program. MBC hired Allen Denton in 2009 to anchor the evening news, and in 2010 Maas joined Denton as co-anchor of that broadcast.

MBC paid Maas less than Denton the entirety of their co-tenure on the evening news. In 2010, MBC paid Maas an annual salary of $120,000, while MBC compensated Denton at $200,000 per year. Both generally received annual raises of $5,000, leaving an apparent $80,000 per-year pay gap through 2017, when Maas earned $160,000 per year.

In late April 2018, Maas sent the following email to station manager and owner Michael McKinnon Jr.:

> "Hi Mike,
>
> "I am circling back to discuss my contract again. It's been a[ ]while.
>
> "I must say that I'm frustrated and a bit embarrassed that it has been 4 months since my contract expired on December 31, 2017, and it has not been dealt with. Our last discussion was in early February.
>
> "I have enjoyed bringing San Diego viewers the news here at KUSI since I started in 2004. But, as you know, that's only part of my job.
>
> "In addition to mentoring young staffers in the newsroom, I am also out volunteering and working in the community on

3

behalf of KUSI. This past month I have emceed ***San Diego Women's Week, The SD District Attorney sponsored Crime Vigil***, and ***The Gold Digger's Hat's Off to SD*** fundraiser. My community service is hard to match. I am highly visible on two boards in San Diego and was awarded the highest philanthropic honor in our community three years ago as a Salvation Army "Woman of Dedication." I love this city and plan to be here forever.

"My experience is also hard to match. I have worked in this market on television since 1990. In my 35 years in broadcasting, I have received more than a dozen Emmy nominations and have been inducted into the NATAS Silver Circle for my on-air contributions. My anchoring skills are second to none at this station. I can confidently say that no one reads the news in the evening anchor chair better than I do.

"When I started on the night shift 8 years ago, I was anchoring 2 hours of news, the 6 & 10 pm. Since then, KUSI has added 2 more evening newscasts. In addition to hosting San Diego People and fronting hourly newsbreaks, I also produce a weekly medical segment called "Healthy Living." I get lots of feedback from my medical segments in the community, and they are available on the KUSI website. The latest one is on Autism.

"As I've told you, I enjoy my job here at KUSI and have a fantastic relationship with everyone in the newsroom, Mornings and Nightside. I'm well aware of the recent lucrative deals you've extended to the male on-air talent and I know how much anchors are compensated here at KUSI. I am your **lead** female evening anchor.

"As the lead female anchor at KUSI, with the community service, experience and skills that I have demonstrated on a consistent basis, there is no reason my compensation should be less than multiple male counterparts at KUSI. Turko would say "It Ain't Right". I would like you to consider increasing my annual salary to be on par with my

evening co-anchor . . . and, I think that is a very reasonable request.

"Sandra"

In a subsequent email, Maas asked for an annual salary of $215,000. In response, MBC offered Maas a three-year contract, with an initial $20,000 raise (a new annual salary of $180,000) and yearly $5,000 raises thereafter. Maas countered with a demand that the initial $20,000 raise be made retroactive to January 1, and for salaries of $190,000 and $195,000 in years two and three. MBC rejected retroactivity and Maas's proposed raises for years two and three. Maas said she would accept MBC's terms, but only for a one-year deal. In June 2018, the parties agreed to the one-year contract with an annual salary of $180,000.

In May 2019, Maas met with the human resources director and the news director Steve Cohen, who informed her MBC would not be renewing her contract. Cohen said the station was "bringing in a new generation of journalists." According to Maas, the human resources director stated, "No, no, no. That sounds like age discrimination, and that's not what we're doing here." Maas left the station a few weeks later, at the end of her contractual term.[1]

---

[1] MBC seeks to file portions of the record under seal. (See Cal. Rules of Court, rule 8.46(d)(2).) The three exhibits MBC seeks to seal are not relevant to our disposition of the issues on appeal. This motion is denied.

5

## B.     This Litigation

Maas filed suit against MBC, alleging:  (1) MBC failed to provide equal pay to women (Lab. Code § 1197.5, subd. (a)); (2) gender and/or age discrimination (Gov. Code § 12940, subd. (a)); (3) failure to prevent discrimination (Gov. Code § 12940, subd. (k)); (4) retaliation under Government Code section 12940, subdivision (h); (5) retaliation under Labor Code section 1102.5; and (6) retaliation under Labor Code section 1197.5, subdivision (j)(1).  Maas voluntarily dismissed several of these causes of action and proceeded to trial on the equal pay disparity claim, the gender/age discrimination claim, and one of the retaliation claims.

Trial took place over four weeks.  The jury found in favor of Maas on her equal pay and retaliation claims, and in favor of MBC on the gender/age discrimination claim.  The jury awarded Maas $1,775,000 and declined to impose punitive damages.  After judgment, the trial court granted Maas's motion for costs and attorney fees, awarding her an additional $2,376,677.50.

MBC appeals the judgment, the attorney fee award, and another postjudgment order discussed *post*.  Maas appeals the attorney fee award.

---

MBC also seeks to seal portions of the March 7, 2023, trial transcript, and submit public sealed and redacted versions thereof.  MBC has established an interest in redacting financial information regarding third parties that overrides the right of public access and supports sealing; there is a substantial probability this overriding interest will be prejudiced if the information is not sealed; and the redactions are the narrowly tailored means to do so, with no less restrictive means available to protect the information. (Cal. Rules of Court, rules 8.46(d)(6), 2.550(d)–(e).)  The parties' stipulated motion to augment the record on appeal with public redacted and sealed versions of the March 7, 2023, transcript is granted.  These documents are hereby deemed a part of the record on appeal.

6

# III.  DISCUSSION

## A.  Alleged Trial Error

MBC argues various errors throughout the trial prejudiced its defense. First, MBC objects to several evidentiary rulings, claiming the trial court improperly (a) admitted expert testimony, (b) limited MBC's cross-examination of Maas, (c) limited MBC's direct examination of Denton, and (d) permitted Maas's counsel to misrepresent testimony during closing argument.  We find no abuse of discretion.

Second, MBC argues the trial court erred by refusing to give special instructions concerning inferences from the evidence.  We find the trial court properly declined MBC's proposed instructions.

Third, MBC argues Maas and her counsel committed misconduct by interjecting "social justice appeals" throughout the trial and especially in closing argument.  MBC has not preserved its challenges to most of these remarks, having failed to object during trial.  The trial court sustained the few objections MBC did make, and we do not find Maas's or her counsel's comments so inflammatory that the jury was incapable of following the court's instructions.

Fourth, MBC claims the trial court erred by limiting closing argument time to 60 minutes and granting Maas an additional 30 minutes for rebuttal argument.  MBC has not shown the trial court abused its broad discretion when setting argument time.

Finally, Maas argues the cumulative effect of the trial error prejudiced its case.  With one exception, which we find was not prejudicial, we do not find any errors to cumulate.

7

1. *Evidentiary Issues*

We review a court's evidentiary rulings for abuse of discretion. (*Hernandez v. Paicius* (2003) 109 Cal.App.4th 452, 456.) A trial court's exercise of its discretion will not be disturbed on appeal absent a showing its decision was arbitrary, capricious, or patently absurd and resulted in a manifest miscarriage of justice. (See, e.g., *People v. Chhoun* (2021) 11 Cal.5th 1, 26.)

a. *Expert Testimony*

MBC argues the trial court erred by admitting the testimony of Maas's expert, Debra Reilly. "A trial court's decision to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.' " (*Kotla v. Regents of University of California* (2004) 115 Cal.App.4th 283, 291 (*Kotla*).) The court's exercise of discretion " ' "is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown." ' " (*Id.* at p. 292.)

MBC moved to exclude Reilly's opinions before trial. After a hearing under Evidence Code section 402, the trial court held Reilly could testify but limited her testimony to opinions on "human resources standards" and MBC's compliance with its own human resources policies. At trial, Reilly testified MBC's human resources director failed to conduct a proper investigation following Maas's email reporting a pay disparity and failed to take steps to prevent retaliation.

MBC first claims Reilly did not offer proper expert opinions because her testimony "was not sufficiently beyond the jury's experience, nor did it assist the jury, for a lawyer to opine that an investigation needs to have experienced people asking pertinent questions in an unbiased manner, of necessary witnesses, while obtaining relevant documents and being fair and

8

thorough." Expert opinion testimony must "[r]elate[] to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) The trial court acted within its discretion by concluding human resources policies and investigations are matters beyond the experience of a typical juror.

Indeed, in *Kotla*, relied on by MBC, the court observed "expert testimony on predicate issues within the expertise of a human resources expert is clearly permissible," noting expert opinion "that the employer significantly deviated from its ordinary personnel procedures in the aggrieved employee's case, might well be relevant to support (or negate) an inference of retaliation." (*Kotla, supra*, 115 Cal.App.4th at p. 294, fn. 6.) While dicta, we agree with this assessment. The trial court did not abuse its discretion by concluding testimony on human resources investigations "by a qualified expert on human resources management[, here Reilly,] might well assist the jury in its factfinding." (*Ibid.*)

MBC next argues Reilly's testimony invaded the province of the jury by opining on the application of law to the facts. Specifically, "Reilly repeatedly asserted that [California Department of Fair Employment and Housing (DFEH)] guidance and [Equal Employment Opportunity Commission (EEOC)] materials imposed certain *requirements* on MBC. Coming from a lawyer, referencing legal-sounding materials, a juror would naturally conclude these were *legal* requirements. Reilly then repeatedly opined that MBC failed to meet or 'deviated' from those supposed legal requirements. This told the jury that MBC acted unlawfully in the circumstances, which is impermissible."

While Reilly opined on MBC's compliance with state and federal guidance on discrimination investigations, none of the claims at trial

9

concerned whether MBC "violated" any DFEH or EEOC guidance documents. MBC suggests these materials do not actually constitute binding legal guidance[2] and has not pointed to any testimony showing the jury was led to believe these standards governed its liability. Reilly's testimony thus did not usurp the role of judge or jury in this respect. (Cf. *People v. Jo* (2017) 15 Cal.App.5th 1128, 1177 (*Jo*) [expert testimony on provision of law not directly at issue in the case was admissible where it "did not encompass any legal conclusion or opinion on any ultimate issue"].)

MBC also argues Reilly "violated the rule against experts instructing the jury as to the law" by opining, "per the EEOC, prior [work] experience [eventually] becomes irrelevant," and per DFEH, "retaliation can occur 'much, much later' after a complaint."

The first opinion was squarely in the context of discussing whether MBC's human resources investigation was appropriate. Reilly noted "an investigator would be asking all of the witnesses about [specific factors] to try to determine if" these factors were "legitimate, credible, [and] reliable as the actual reason" for a pay disparity, "[a]nd then you would . . . match them up to the person you're comparing it to and see if that factor really is the actual reason for the pay discrepancy." She quoted the EEOC guidance as stating, "The difference in education, experience, training, or ability must correspond to the compensation disparity. . . . A very slight difference in experience would not justify a significant compensation disparity. Moreover, continued reliance on pre-hire qualifications is less reasonable the longer the lower-paid employee has performed at a level substantially equal to or greater than his

_____

2       The record does not include these documents.

10

or her counterpart." Reilly further stated she did not think MBC's human resources director "analyzed these issues," noting,

> "[T]hings that happened a long, long time ago that—you know, a decade ago or more than that ago, they're not—an investigator is supposed to look and see if they're even relevant anymore because so much time has passed where the two comparators have been doing the same job. [¶] Something that happened a long, long time ago, that's what that last sentence is about. If you're relying on something that happened pre-hire, a long time ago, it's not really—it's not really relevant anymore because it plays no role in what they're doing day to day, then you, as the investigator, would give little weight to that prior education, prior experience, prior training, or prior ability. Because it's no longer really a factor in what they're doing now."

Reilly did not instruct the jury on the law by explaining what circumstances *investigators* are supposed to consider.

Reilly also testified it is important for investigators to admonish both witnesses and whistleblowers that retaliation is not permitted. She stated she did not see any evidence MBC's investigator gave any such admonitions. Counsel then asked, whether, "[a]ccording to the DFEH guidelines, . . . retaliation ha[s] to happen right after the incident is reported," to which she answered no. She agreed with counsel's statement it could "happen much, much later." Although less clearly limited to her assessment of the investigation than were other comments, we do not see any abuse of discretion in admitting this testimony. Again, MBC does not claim the DFEH guidelines constitute law and does not point to any indicia in the record the jury would have thought these provisions governed its assessment of the case. Moreover, Reilly did not apply the guidance to the facts of this case and thus did not offer any legal conclusions. (See *Jo, supra,* 15 Cal.App.5th at p. 1177.)

11

b. *Limitations on Cross-examination of Maas*

MBC argues the trial court "erred by curtailing MBC's cross examination of Maas about" her "perception of her own value." But MBC fails to explain in its opening brief in what way the trial court "curtail[ed]" the cross examination or to explain how its rulings constituted an abuse of discretion. "We are not bound to develop appellants' arguments for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contentions as [forfeited]." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 (*Falcone*).) Although MBC attempts to raise more specific arguments in its reply brief, we decline to consider these belated contentions. (See, e.g., *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 (*Neighbours*) [an "appellant [must] present all of his points in the opening brief" and "points raised in the reply brief for the first time will [generally] not be considered"].)

In a related argument, MBC notes the court sustained "vagueness objections to questions of Maas as to the fact that the market had valued Denton more highly than her, and sustained its own objection that the question called for a legal conclusion." MBC has not explained how the one vagueness ruling it cites constituted error, forfeiting such argument. (See *Falcone, supra,* 164 Cal.App.4th at p. 830.)

MBC also suggests the court abused its discretion by making inconsistent rulings with respect to "legal conclusion" objections. The court first sustained the following objection:

> "[MAAS:] I think I had more value in the market than Allen Denton.
>
> "[DEFENSE COUNSEL:] Okay. But the market said otherwise, didn't it.
>
> "[PLAINTIFF'S COUNSEL:] Argumentative.

12

"THE COURT: Calls for a legal conclusion.

"[PLAINTIFF'S COUNSEL:] Yes.

"THE COURT: Sustained."

The court later overruled objections to defense counsel's questions, "In 2019, what did you believe your market value as an anchor was?" and, "Did you have an estimate of what your market value was in terms of a yearly salary?"

Whether or not the first question asking "But the market said otherwise, didn't it" called for a legal conclusion, the court properly sustained an objection to it because the question was argumentative. In effect, counsel was asking Maas to agree that *objective* circumstances proved her market value was less than she believed. This was an argument to the jury rather than relevant testimony from Maas. (See *People v. Chatman* (2006) 38 Cal.4th 344, 384 ["An argumentative question that essentially talks past the witness, and makes an argument to the jury, is improper because it does not seek to elicit relevant, competent testimony, or often any testimony at all."]) In contrast, the later questions posed by plaintiff's counsel concerned Maas's *subjective* estimate of her value. We do not find the court's differing approach to these inquiries to be an abuse of discretion..

c. *Limitations on Direct Examination of Denton*

MBC argues the trial court abused its discretion by sustaining "relevancy objections to questions to Denton about what facts he knew before a supportive text to Maas about her lawsuit," pointing to the following exchange:

> "[DEFENSE COUNSEL:] All right. You expressed some sympathy to Ms. Maas when you learned KUSI was letting her go; right?
>
> "[DENTON:] Absolutely.

13

"[DEFENSE COUNSEL:] At that time, were you aware that she had been offered a three-year deal and turned it down for a one-year deal?

"[DENTON:] No, I did not—

"[PLAINTIFF'S COUNSEL:] Relevancy.

"THE COURT: Hold on, Mr. Denton. I'm going to sustain the objection.

"[DEFENSE COUNSEL:] At that time, did you have any awareness of what her contract negotiations had been?

"[PLAINTIFF'S COUNSEL:] Relevancy.

"THE COURT: Sustained."

According to MBC, "Denton's ignorance of the[se] facts tended to prove that *his text* was uninformed, and therefore meaningless." (Italics added.) But defense counsel had not introduced a text message from Denton before asking this question. And counsel asked specifically whether Denton had "expressed some sympathy to Ms. Maas when [he] learned KUSI was letting her go," not whether he was supportive of her lawsuit. The text message Denton sent was in response to a news article about Maas's lawsuit, stating "Looks like you nailed it. They screwed ya . . . you deserve every single dollar!" It is thus not clear how the court could have determined counsel's questions related to that specific text message.[3] MBC has not shown any error in the trial court's handling of this issue.

---

[3] Indeed, it appears counsel was not addressing the text message as it was only later in Denton's testimony that counsel asked, "Did [Maas] forward you a news story about her lawsuit at some point in time?"

### d.    *Misstated Testimony*

MBC argues the trial court erred by admitting the following exhibit:



Maas's counsel displayed this slide during closing argument while stating, "Mr. Cohen also said Maas actually did more work for KUSI than Denton considering she did the Healthy Living segment."  MBC argues this was error because Cohen did not say this exact phrase during his trial testimony. Cohen testified:

> "[PLAINTIFF'S COUNSEL:]  And on the issue of preparedness and hours, you understand that Ms. Maas had a Healthy Living segment that she prepared every week; correct?
>
> "[COHEN:]  At some point, she began a Healthy Living segment, which was I think probably two—two minutes and 30 seconds to 3:30 of content that she—that she put together each week that we ran, yes.
>
> "[PLAINTIFF'S COUNSEL:]  Okay. And that's in the 2016, 2017 time frame?

"[COHEN:]  Yes.

"[PLAINTIFF'S COUNSEL:]  Thank you, sir.  And Allen Denton didn't have that responsibility; correct?

"[COHEN:]  No."

MBC's counsel later read aloud from Cohen's deposition testimony, in which he testified Denton did not have an "additional duty" like the Healthy Living segment because Denton anchored the 11:00 news.

It thus appears the slide did not display a direct quote from Cohen's testimony, despite putting the language in quotation marks.  However, even assuming the trial court erred,[4] MBC has not established prejudice.  Cohen testified Maas did the Healthy Living segments, an "additional duty," and Denton did not.  While it may have been an exaggeration of his literal testimony, counsel's representation was not unsupported.

In addition, both sides questioned Cohen about the Healthy Living segment, allowing the jury to hear more about his view of the quality and nature of that work.  The jury was instructed demonstrative exhibits had "not been admitted into evidence" and would not be available to the jurors during deliberation.  The jury was told it could "consider the testimony given in connection with these materials."  The jury was also instructed lawyers' arguments are not evidence.  In general, courts presume juries dutifully follow instructions given by the trial court.  (*Richardson v. Marsh* (1987)

---

[4]    We note neither the slide nor the closing argument represented that Cohen had made this statement during his trial testimony.  Rather, both concerned statements made about Maas "before the lawsuit."  What Cohen said during his trial testimony is potentially beside the point, as other evidence could also establish what Cohen said before the litigation.  Nonetheless, because the parties focus on Cohen's trial testimony, we address this argument on those terms.

16

481 U.S. 200, 208, 211.) We do not see any reason to assume the jury ignored the actual testimony in favor of counsel's characterization in closing. Thus, even assuming this was a misstatement of the evidence, we find it was not prejudicial. (Cf. *People v. Dennis* (1998) 17 Cal.4th 468, 519 [no prejudice where "trial court admonished the jury . . . not to mistake counsel's statements for evidence" even though there was a "minor variance" between the argument and "the evidence actually presented"].)

2. *Instructional Error*

MBC argues the court erred by failing to instruct the jury with three of its proffered special instructions. With respect to pay discrimination, MBC asked the court to instruct the jury, "Salary negotiation, where equally available to both sexes, may be a legitimate, non-discriminatory explanation for a pay differential." With respect to Maas's retaliation claim, MBC requested the following two instructions:

> "An employer's positive employment action following an employee's alleged protected activity negates an inference of retaliation."

> "The passage of time between an employee's alleged protected activity and an employer's alleged retaliatory action negates an inference of retaliation."

The court declined to give these instructions.

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) However, "[t]he giving of an instruction argumentative in form is error." (*Slayton v. Wright* (1969) 271 Cal.App.2d 219, 238.)

17

Moreover, "[a] court may—and, indeed, must—refuse an instruction that is an incorrect statement of the law." (*People v. Mickey* (1991) 54 Cal.3d 612, 695.)

MBC does not cite any caselaw supporting its proposed salary negotiation instruction. The only case cited, *Hicks v. KNTV Television, Inc.* (2008) 160 Cal.App.4th 994, 1004, held there were "legitimate, nondiscriminatory reason[s]" for a local news channel's decision not to renew a contract with an African American anchor. It does not support the contention the availability of negotiation itself is such a factor. (See *ibid.*) Nor do we agree this instruction is a fair interpretation of California law, as a salary negotiation is a process that may involve legitimate or discriminatory considerations. The trial court properly rejected this instruction.

MBC's proposed retaliation instructions are also incorrect and argumentative insofar as they claim specific factors "*negate[]* an inference of retaliation." Negate means "[t]o nullify" or "render ineffective." (See Black's Law Dict. (12th ed. 2024) p. 1240, col. 1.) As drafted, these instructions would have put a thumb on the scale in MBC's favor by overstating the import of these factors. (See, e.g., *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 421 [Although "[a] long period between an employer's adverse employment action and the employee's earlier protected activity may lead to the inference that the two events are not causally connected," "if between these events the employer engages in a pattern of conduct consistent with a retaliatory intent, there may be a causal connection"]; *Robinson v. Southeastern Pa. Transp. Auth., Red Arrow Div.* (3d Cir. 1993) 982 F.2d 892, 894 ["The mere passage of time is not legally conclusive proof against retaliation."]; *Negron-Marty v. Wal-Mart Puerto Rico, Inc.* (D.P.R. 2012) 862 F.Supp.2d 48, 71 [intervening "positive

18

employment actions are not an affirmative defense to liability" for retaliation].)

MBC misunderstands the cases it relies on in support of its "passage of time" instruction. These essentially hold an employer's knowledge of protected activity and the adverse employment action must be quite close in time for the temporal proximity *alone* to support an inference of retaliation. (See *Le Mere v. Los Angeles Unified School Dist.* (2019) 35 Cal.App.5th 237, 243; *Clark County School Dist. v. Breeden* (2001) 532 U.S. 268, 273; *Kama v. Mayorkas* (9th Cir. 2024) 107 F.4th 1054, 1061.)

We are not persuaded by the unpublished federal cases MBC relies on in support of its "positive employment action" instruction to the extent they suggest intervening positive employment actions are dispositive. (Compare *Ghirmai v. Northwest Airlines, Inc.* (9th Cir. 2005) 131 Fed.Appx. 609, 611 ["intervening events, such as [manager's] positive reviews and assistance, break the causal connection"] and *Miglani v. Edwards Lifesciences, LLC* (C.D. Cal. Jan. 8, 2018, No. 8:17-cv-00418-JLS-DFM) 2018 U.S.Dist. Lexis 227485 ["Plaintiff was given a positive performance review and a bonus after any 2015 conversation. This fact negates any suggestion that later discipline was retaliation" for that conversation] with *Dumas v. Union Pacific R.R. Co.* (5th Cir. 2008) 294 Fed.Appx. 822, 827 ["lapse of time and the intervening positive employment action" weakened inference of causal link between protected activity and termination but were "not conclusive"]; *Jeffries v. Wal-Mart Stores, Inc.* (6th Cir. 2001) 15 Fed.Appx. 252, 261 ["While an intervening promotion may *undermine* the strength of the inference, Wal–Mart has cited no authority for the proposition that such a promotion *defeats, as a matter of law*, the causal link between a protected activity and a subsequent adverse employment action."].)

The trial court properly rejected MBC's instructions as proposed, and instead instructed the jury it could only find retaliation if it concluded Maas's reporting illegal conduct "was a contributing factor in [MBC's] decision to subject her to an adverse employment action by not renewing [her] contract." (See *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703, 713–714 [whistleblower plaintiff "may satisfy [her] burden of proving unlawful retaliation even when other, legitimate factors also contributed to the adverse action"].)

3. *"Social Justice Appeals"*

MBC claims Maas and her counsel made inappropriate references to issues of societal inequality, "invit[ing] the jury to decide the case on an improper basis." As explained *post*, MBC has not preserved this argument for appeal.

a. *Gender-Related Statements and "Me Too Evidence"*

MBC first points to statements in Maas's opening statement and closing argument it claims were objectionable. In opening statement, Maas's counsel described Maas as someone who "considers herself a . . . champion of women's rights." In closing argument, Maas's counsel stated: (1) "each of us sitting and standing in this courtroom has a vested interest in this case"; (2) gender discrimination, equal pay, and retaliation are "deeply rooted . . . in the corporations in this country and in [MBC] and . . . remain woven into the fabric of their culture and . . . these systemic inequalities are silenced"; (3) "[t]his is just one of many cases, one of many cases that typically go unheard and unaddressed"; (4) "[t]his is a case that is relevant not just to Ms. Maas, but to women who suffer pay disparity all over this country"; and (5) "we need you, members of the jury, to put 'Yes' on the punitive damages box to punish them for what they have done to Sandra Maas and other

20

women in the community."  MBC did not object to any of these statements below and has not preserved these issues for appeal.  (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1333 [defendant forfeited challenge to statements made in prosecutor's closing argument by failing to make timely and specific objection].)

To circumvent forfeiture, MBC suggests objections to these statements would have been futile, arguing "time pressures prevented proper objections, admonitions, and curative instructions to counter all of counsel's misconduct."  MBC specifically claims the court "made it clear that because of time pressures, [it] did not want interruptions to closing arguments."  The record belies these contentions.

The court explained the parties were to exchange all demonstrative visual aids before their closing arguments because "the other side has to have a right to object."  It is in this context the court added, "I do not want a bunch of interruptions during closing argument."  Moreover, MBC was aware of its ability to object since it raised four objections during Maas's closing argument—three of which were sustained.  The court also agreed to give two curative instructions after closing arguments, demonstrating the court was willing to provide such instructions despite "time pressures."  MBC does not claim the court refused any requested curative instructions.

MBC also complains Maas's counsel used a picture showing "a crowd of protesters holding signs demanding 'Equal Pay' and 'When will this change?' "  While MBC objected to three exhibits, it did not object to Maas's use of the "Equal Pay" graphic.  It has thus forfeited its challenge.

MBC next argues Maas's counsel made "improper appeals" in its questioning of witnesses, first by asking one witness whether KUSI's broadcasts covered "the pay gap [between men and women] in this country"

and whether McKinnon thought the issue was important, then by asking another why "KUSI continually and always" paired "much older men with younger females." However, in the first exchange, the court sustained all of MBC's objections. In the second exchange, the court only overruled one of MBC's objections:

> "[PLAINTIFF'S COUNSEL:] Did you ever have any conversations with Steve Cohen or either of the McKinnons about why KUSI continually and always pairs much older men with younger females?

> "[DEFENSE COUNSEL:] Objection; assumes facts not in evidence.

> "THE COURT: Overruled. You may answer, Mr. Rudy.

> "[WITNESS:] That would not be a conversation I would have with Mr. Cohen or the McKinnons.

> "[PLAINTIFF'S COUNSEL:] You've been in the news business for how many years now?

> "[WITNESS:] This will be 40.

> "[PLAINTIFF'S COUNSEL:] Do you know why it is that stations like KUSI pair older anchors, [W]hite anchors, older [W]hite men, with younger females?

> "[DEFENSE COUNSEL:] Objection; lacks foundation.

> "THE COURT: Sustained.

> "[PLAINTIFF'S COUNSEL:] With regard to your experience at KUSI, did you ever find out or make an effort to find out why KUSI—KUSI paired older [W]hite gentlemen, anchors, with younger females?

> "[DEFENSE COUNSEL:] Objection; assumes facts not in evidence and misstates the evidence.

> "THE COURT: Sustained.

"[PLAINTIFF'S COUNSEL:] Sir, given your experience at KUSI, did you notice a pattern of older men working with younger women?

"[WITNESS:] I never really gave it much thought. So no, I didn't notice."

MBC's counsel did not object during either exchange on the grounds argued here on appeal. To preserve an issue for appeal, an objection must be sufficient "to enable the court to make an informed ruling on the motion or objection." (*People v. Mattson* (1990) 50 Cal.3d 826, 854.) None of MBC's objections, whether sustained or overruled, alerted the trial court to the argument it is advancing on appeal. (See, e.g., *People v. Demetrulias* (2006) 39 Cal.4th 1, 20–21 (*Demetrulias*) [objections regarding relevance, non-responsiveness, foundation, and speculation did not "alert the trial court to the claim that the testimony objected to is inadmissible character evidence"].) That argument is thus forfeited with respect to these questions.

In any event, we see no likelihood counsel's questions swayed the jury, especially in light of the court's instruction: "The attorneys' questions are not evidence. Only the witnesses' answers are evidence. You should not think that something is true just because an attorney's question suggested that it was true."

MBC next claims Maas improperly testified about more general discrimination by MBC and in the broader community. MBC has not preserved its arguments with respect to that testimony either.

In cross examination, defense counsel asked Maas, "What you're seeking through this lawsuit is money; right?" Maas responded, "What I'm seeking in this lawsuit, to expose [MBC] for what it is. They are not a friend of women." The court overruled MBC's motion to strike this answer as nonresponsive. MBC does not argue the trial court's ruling was an abuse of

23

discretion. Nor did MBC's objection alert the court to other grounds for exclusion. (See, e.g., *Demetrulias, supra*, 39 Cal.4th at pp. 20–21.)

MBC also points to Maas's statement, "I am seeking justice, [counsel]. My story is not unusual at [MBC]. There are other women in that newsroom who are afraid to share what happened to them." The trial court partially sustained MBC's objection that the testimony was "not . . . based on personal knowledge and beyond the call of the question," instructing the jury to disregard the last sentence. But again, MBC's objections did not fairly alert the trial court to the concern that any part of the testimony included "improper me too'-type evidence," as it now argues. (See *Demetrulias, supra*, 39 Cal.4th at pp. 20–21.) Therefore, it has not preserved this argument for appeal, either.

In addition, MBC moved to strike Maas's answer after she stated, "Female journalists at KUSI when they got wind of my lawsuit, Sasha Foo told me she hadn't had a raise in 13 years. . . . Ashlie Rodriguez—" Counsel did not provide grounds for the motion, stating only "I'm going to move to strike." The court then announced the afternoon recess and asked to see counsel in chambers. Although MBC now argues this should have been stricken as "me too-type" evidence, the record does not reflect it made this objection contemporaneously. MBC has thus not preserved the argument for appeal. (See Evid. Code, § 353, subd. (a) [objection must "make clear the specific ground of the objection"].)

Finally, MBC cites testimony to which no objection was made. Because MBC did not object to this testimony at all, it has not preserved the question of its propriety for appeal. (See Evid. Code, § 353, subd. (a).)

b. *Race-Related Statements*

MBC argues it was also prejudiced by several allusions to race during trial. It first points to Maas's statement MBC had presented an abridged version of her social media posts, leaving out pictures with her "ethnically diverse group of friends." But by failing to object to this statement MBC has not preserved its argument on appeal. (See Evid. Code, § 353, subd. (a).)

MBC next points to questions Maas's counsel asked about why KUSI paired older, "[W]hite" male anchors with younger female anchors. The court sustained all of MBC's objections to these questions. In any case, we do not find stray references to "[W]hite" men particularly inflammatory and, as previously explained, the jury was instructed counsel's questions are not evidence.

Finally, MBC points to a statement in Maas's rebuttal argument to the jury, urging jurors to reject part of MBC's theory because "if [it] were the case, . . . women and people of color" would be "in a very bad position." The court sustained MBC's objection. Again, we do not think this statement was so inflammatory that the jury was incapable of disregarding it in accordance with the trial court's ruling.

4. *Closing Argument Time Limits*

MBC argues the trial court abused its discretion by limiting closing argument to 60 minutes per side and granting Maas an extra 30 minutes for rebuttal. "Trial courts have broad discretion to control the duration and scope of closing arguments." (*People v. Simon* (2016) 1 Cal.5th 98, 147.) A trial court's "determination of the proper allotment will seldom be disturbed

on appeal." (*People v. Fairchild* (1967) 254 Cal.App.2d 831, 841.) We find the trial court did not abuse its broad discretion in the circumstances of this case.

The court advised counsel in advance it would impose time limits on closing argument. In response to MBC's request for two and a half hours to argue, the court stated, "I have never had a closing go that long. And while this is a complex case, I've had plenty of cases in different areas that are just as complex, if not perhaps a little even more complicated." MBC told the trial court its argument could be shorter if the court had given MBC more time "to dwell on the defense evidence." The court directly responded to this assertion, explaining the defense had initially requested three days for its defense then adjusted its estimate to two days, and ended up using approximately two and a half days. The court also noted it had allowed MBC leeway to present some of its defense during Maas's case in chief, and stated, "I'm starting to hear some of the same testimony over and over again. So I'm not certain what more you want to put on that we haven't already heard." Counsel for MBC did not identify any additional evidence it wanted to present and acknowledged MBC had time to present evidence during Maas's case in chief.

On appeal, MBC argues the closing argument time limit prevented it from addressing specific issues, including: (1) "Maas's counsel's efforts to sway the jury with irrelevant and improper arguments about the pay gap in society at large, social justice, and the notion of wrongful termination"; (2) a recruiting email sent to another anchor after Maas's complaint about unequal pay; (3) "positive employment actions that followed Maas's allegedly whistleblowing email"; and (4) "demonstrative exhibits illustrating [witness]

26

testimony about how little work Maas performed in preparing her Healthy Living segments."[5]

Even if the trial court might have granted MBC more time for argument, on appeal we are not free to supplant our judgment for that of an experienced trial judge who is aware of the facts of the case. (See *Herring v. New York* (1975) 422 U.S. 853, 862 ["The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations."]; *Hollywood v. Superior Court* (2008) 43 Cal.4th 721, 729 [trial courts are better situated than appellate courts to evaluate issues "in light of the entirety of a case"].) The trial court's limitation in this case was not so severe as to constitute an abuse of its broad discretion. Indeed, as a leading treatise notes, "arguments longer than an hour are often lost on the jury." (Fairbank et al., Cal. Practice Guide: Civil Trials & Evidence (The Rutter Group 2024) ¶ 13:29, p. 13-7.)

Nor do we agree it was an abuse of discretion to grant Maas an additional 30 minutes for rebuttal argument. MBC cites two out-of-jurisdiction cases, neither of which supports the claim parties *must* have equal time for closing argument. (See *Maloney v. Brassfield* (Colo.App. 2010)

---

[5] Under the heading "MBC Was Denied Adequate Time for Closing Argument," MBC also argues the court erred by excluding some of the demonstrative exhibits it sought to use during a witness's testimony. To the extent MBC intended to challenge this ruling, it has forfeited its arguments by failing to present them under an appropriate heading. (*Bitner v. Department of Corrections & Rehabilitation* (2023) 87 Cal.App.5th 1048, 1065 [" 'Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading.' "].) In any event, if we were to reach the issue, MBC fails to explain how the exclusion of these items resulted in prejudice, thus forfeiting any such arguments. (See, e.g., *Asaro v. Maniscalco* (2024) 103 Cal.App.5th 717, 728, fn. 4 [a party forfeits arguments not briefed on appeal].)

251 P.3d 1097, 1103 [finding no abuse of discretion in time limits imposed for presentation of evidence]; *Latino Officers Ass'n v. City of New York* (S.D.N.Y. Oct. 8, 2003) 2003 U.S.Dist. Lexis 17778 [imposing time limits for trial as a whole, and stating, "Fairness dictates that defendants be given equal time"].) Rather, a trial court is free to balance the requirements of each case to fairly allocate argument time. Although the trial court did not explain its reasoning, Maas had the ultimate burden of persuasion on her claims. (See, e.g., *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 215 [In an employment discrimination case, "[t]he ultimate burden of persuasion on the issue of discrimination remains with the plaintiff"]; *Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1220 [same, retaliation].) In light of this burden, there was a rational basis for the trial court to grant Maas additional time for rebuttal.

MBC claims comparative burdens cannot justify the discrepancy in the time given by the court to each side for closing argument, maintaining MBC "bore a larger burden of proof than Maas." According to MBC, it had the burden of establishing the principal issues in contention, (1) whether "bona fide factors other than sex justified the pay differential" and (2) whether "its non-renewal decision would have been made regardless of her age and gender." But to establish her equal pay claim, Maas had to prove she "was performing substantially similar work as [Denton] considering the overall combination of skill, effort, and responsibility required" and she "was working under similar working conditions as" Denton. Maas's skill and effort were sharply disputed at trial, with MBC arguing Maas did not work as hard as Denton and lacked his experience and talent. We do not agree that the elements of Maas's claim had been conceded.

28

Moreover, to establish her gender and age discrimination claim, she had to prove her "gender and/or age was a substantial motivating reason for [MBC's] decision to not renew [her] contract." And to establish her retaliation claim, she had to prove her reporting of illegal conduct "was a contributing factor in [MBC's] decision to subject her to an adverse employment action by not renewing [her] contract." These issues overlap significantly with MBC's affirmative defense as they bear on the reason for MBC's decision not to renew her contract. It is thus not accurate to say MBC had the burden of proof on the principal issues in dispute. MBC has not shown the trial court's allocation of argument time was an abuse of discretion.

5.      *Cumulative Error*

MBC argues but for the cumulative effect of the alleged trial errors, there is a reasonable probability the jury would have found for MBC. As discussed above, we do not agree there were significant errors or irregularities, and the one potential error, permitting Maas to present an interpretation of Cohen's testimony as a direct quote, was not prejudicial.[6]

 **B.    Attorney Fees**

MBC argues the trial court erred by awarding Maas fees without adjusting for her unsuccessful claims or cutting fees based on "unsupportable time entries." In her cross-appeal, Maas argues the trial court erred by failing to use a multiplier to increase her fee award. An award of attorney fees "is left to the sound discretion of the trial judge, who is in the best

---

[6]      For the first time in its reply brief, MBC appears to argue the trial court should have granted its motion for judgment notwithstanding the verdict because there was no substantial evidence supporting the jury's retaliation verdict. MBC has forfeited this argument by failing to make it in its opening brief. (See *Neighbours, supra*, 217 Cal.App.3d at p. 335, fn. 8.)

position to evaluate the services rendered, and the court's decision will not be disturbed on appeal unless it is clearly wrong." (*City of Oakland v. Oakland Raiders* (1988) 203 Cal.App.3d 78, 85.) As we shall explain, neither party has shown the court's order was clearly wrong.

1. *MBC's Appeal*

MBC argues "the trial court deducted only $44,782.50" from Maas's requested fee award instead of the $195,085 MBC objected to. In fact, through a combination of reducing the requested rates and cutting claimed hours, the court reduced the requested fees by $348,208.50. It is unclear how MBC can establish error when the trial court apparently reduced the award by more than MBC requested. In any case, according to the trial court's order, it "performed an extremely detailed analysis of the disputed hours and exercised its best judgment in agreeing with some objections, and disagreeing with others." This "detailed analysis" is reflected in specific recalculations as to each timekeeper. MBC has not provided this court with sufficient grounds to second-guess the trial court's best judgment.[7]

MBC also argues the trial court should have reduced Maas's fee award to reflect her limited success. MBC claims the trial court erred as a matter of law by failing to consider this factor at all. In opposing Maas's motion, MBC urged, "[a]ny fee award should reflect [Maas's] watered-down result" in comparison to what Maas originally sought. In response, Maas argued "there was substantial overlap on the activities necessary to prosecute [all] the employment claims in this matter, as the factual and legal issues were

---

[7] Rather than brief its arguments on appeal, MBC merely lists purported failings it states are "detailed in MBC's opposition to Maas's motion" in the trial court. "We do not consider such arguments on appeal." (*Garrick Development Co. v. Hayward Unified School Dist.* (1992) 3 Cal.App.4th 320, 334.)

inextricably intertwined." The trial court stated it had "fully considered the arguments of all parties, both written and oral." We therefore must assume the court fully considered the arguments concerning Maas's degree of success. (See *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140 (*Ketchum*) [" ' "All intendments and presumptions are indulged to support [the ruling] on matters as to which the record is silent, and error must be affirmatively shown." ' "].)[8]

MBC next claims the court was required to "articulate a clear explanation of its reasoning," relying on a quote from *Harman v. City & County of San Francisco* (2006) 136 Cal.App.4th 1279, 1317. In California, " 'there is no general rule requiring trial courts to explain their decisions on motions seeking attorney fees.' " (*Gunther v. Alaska Airlines, Inc.* (2021) 72 Cal.App.5th 334, 361.) *Harman* concerned fees arising under 42 United States Code section 1988 and made a noted departure from California's default rule, stating, "in reviewing a federal remedy, it is reasonable to insist on a record adequate to allow a meaningful review of federal standards governing the remedy." (*Harman*, at p. 1308.) Because the fees at issue were awarded under Labor Code sections 1102.5 and 1197.5, subdivision (h), there is no cause to depart from standard state practice.

MBC also cites *Espejo v. The Copley Press, Inc.* (2017) 13 Cal.App.5th 329, 382 (*Espejo*), for the proposition "a fee award must be reversed and remanded where a trial court fails to follow the Supreme Court's *Hensley v. Eckerhart* (1983) 461 U.S. 424, 437 two-step inquiry, and fails to explain why a fee reduction is unwarranted in light of a plaintiff's limited success." In

---

[8] We note MBC has not provided a record of what was discussed at the motion hearing, and " '[i]t is the burden of the party challenging the fee award on appeal to provide an adequate record to assess error." (*Ketchum, supra*, 24 Cal.4th at pp. 1140–1141.)

*Espejo*, the trial court awarded damages to a class of plaintiffs for unreimbursed business expenses. (*Espejo,* at p. 341.) On appeal, the court found the damages award "fail[ed] to take into account clearly specified credits, reversals, and payments to [the plaintiffs] in the business expense categories at issue in determining the amount of restitution to award," reversing and remanding for the court to recalculate the appropriate damages. (*Id.* at pp. 368, 370, 386.)

The court also "conclude[d] the trial court should reconsider the amount of the [attorney fee] award in light of the possible reduction of plaintiffs' monetary award on remand," noting, "[b]ecause the degree of success plaintiffs will achieve after redetermination of their monetary award on remand may change, the court's assessment of the degree of success achieved by plaintiffs' counsel could also change." (*Espejo, supra*, 13 Cal.App.5th at p. 381.) The court observed the order did "not reflect that the [trial] court applied the *Hensley* two-step inquiry or otherwise considered plaintiffs' limited success in determining the amount of their fee award." (*Id.* at p. 382.) However, the remand on attorney fees was not *because* of a lack of reasons in the order, but because the potential damages adjustment would potentially affect the fee analysis. (See *ibid.*) Because we do not disturb the underlying judgment, we have no reason to ask the court to reassess its fee award.

With respect to the substance of the court's award, MBC argues a reduction was required because "Maas sued on seven causes of action" and only prevailed on two. But fees should not be "reduced when a plaintiff prevails on only one of several factually related and closely intertwined

32

claims." (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 989.) Maas's unsuccessful claims were closely intertwined with her prevailing claims.

Before trial, Maas voluntarily dismissed two of her retaliation claims and her claim that MBC failed to prevent discrimination. The retaliation causes of action were largely duplicative, alleging under different legal theories that MBC retaliated against Maas for advocating against gender discrimination and unequal pay. Maas's failure to prevent discrimination claim was also closely related to her other claims, as indicated by the trial court's ruling that Reilly could testify on MBC's failure to investigate pay inequity even after Maas dropped her failure to prevent discrimination claim.

Maas lost her age and gender discrimination claim at trial, but the court could have reasonably concluded the theories were also factually related to and closely intertwined with her prevailing claims. The basis for Maas's gender discrimination claim was MBC's refusal to renew her contract. This arises from the same factual nexus as the equal pay and retaliation claims. Maas's age discrimination claim arose largely from statements made by Cohen after she was informed her contract would not be renewed. The circumstances under which Maas left KUSI also closely connect with Maas's retaliation and gender discrimination claims.[9] For example, Maas alleged in her complaint, "KUSI treated [Maas] differently than her male peers. At KUSI, male anchors were given the opportunity to determine when to leave the job. At KUSI, the standard was different for women over forty compared

_____

[9]    Although MBC argues in its reply brief the age discrimination claim "was entirely separable, as age discrimination is a distinct wrong, and requires proving a distinct set of facts" it fails to provide any record citations or authority for these assertions.

to men over forty.  According to KUSI, women over forty had a 'cycle' and had to make room for a 'new generation,' while men over forty did not."

In sum, MBC has not provided any basis to believe the trial court failed to consider Maas's limited success.  Nor has MBC shown the award of attorney fees, compared to the overall relief obtained by Maas, was so disproportionate as to constitute an abuse of discretion.

2.    *Maas's Cross-Appeal*

Maas argues the trial court abused its discretion by failing to enhance the fee award in light of contingency fee risk.  A court may apply a "multiplier" to the lodestar amount to account for contingency risk.  (See *Serrano v. Priest* (1977) 20 Cal.3d 25, 48.)  The purpose of such a multiplier is to account for the risk of loss and delay in payment in contingency fee cases and thus persuade attorneys to take on cases of significant public interest. (See *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 395.)  However, a court may also decide instead to include the contingency risk value in setting the lodestar itself, in which case it would deny a multiplier.  (*Ibid.* ["The contingency adjustment may be made at the lodestar phase of the court's calculation *or* by applying a multiplier to the noncontingency lodestar calculation (but not both)"] italics added.)  That is apparently what the court did here, stating:

> "After reviewing the moving, opposing, and reply points and authorities and all declarations submitted, the Court finds the rates charged by other counsel in employment actions are commensurate with those awarded to plaintiff's counsel in this matter.  The Court finds the rates listed take into account the risk and delay in payment."

Maas nonetheless claims the trial court's explanation of its decision is deficient, citing *Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 626.  In *Ramos,* this court found the trial court's application

of a large multiplier (2.5) was an apparent abuse of discretion because the record reflected the trial court counted "the same factors" when setting the lodestar and when applying a multiplier, thus "creat[ing] a windfall." (*Ibid.*) The court also found "[a] reasonable exercise of discretion [would] not allow" the very high hourly rate after the multiplier "except in truly pioneering and high risk cases." (*Ibid.*) Because this court did "not understand the trial court's apparent conclusion that this is such a case," it said it "require[d] more explanation before we may uphold it . . . as a valid exercise of discretion." (*Ibid.*) Thus, in *Ramos*, the trial court's exercise of discretion was not supported by the record and the order contained an apparent legal error.

Here, the court expressly stated it considered "the risk and delay in payment" when considering appropriate hourly rates for Maas's counsel. Maas's arguments to the contrary lack foundation. Although Maas also complains it is unclear how the court assessed appropriate rates, " '[t]he value of legal services performed in a case is a matter in which the trial court has its own expertise. [Citation.] The trial court may make its own determination of the value of the services contrary to, or without the necessity for, expert testimony.' " (*PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1096.) Maas fails to point to anything in the order or the record that would suggest an abuse of discretion.

## C. MBC's Second Appeal

Shortly after trial, Maas filed an ex parte application claiming MBC was selling KUSI's assets to another corporation. By stipulated order, MBC agreed to deposit $6,331,910.15 with the court, and Maas agreed to delay enforcement of the judgment until after the sale of KUSI.

After MBC filed its first appeal, the parties engaged in settlement discussions. Eventually, these negotiations reached an impasse.

On February 14, 2024, MBC filed a notice and "Amended Notice of Availability of Funds on Deposit to Satisfy Judgment," stating MBC "hereby makes the $6,331,910.15 on deposit with the Court available to [Maas] to the extent needed to satisfy the Judgment." MBC calculated the amount owed as $4,496,253.02. MBC claimed this notice stopped the accrual of interest under Code of Civil Procedure[10] section 685.030. MBC also "reserve[d] its right to obtain disbursement of all funds on deposit with the court in excess all of the amount needed to satisfy the judgment." Maas would not accept payment from MBC because, among other things, she sought fees and costs she had incurred in connection with enforcing the judgment, and motion for such costs must "be made before the judgment is satisfied in full." (§ 685.080, subd. (a).) On March 20, 2024, Maas filed a motion seeking $105,845.00 in postjudgment attorney fees. That same day, MBC filed a motion for determination of judgment satisfaction. The trial court held a hearing on both motions on April 12 and issued its order on April 18.

The court disagreed with MBC's argument that its notice and "Amended Notice of Availability of Funds on Deposit to Satisfy Judgment" stopped the accrual of interest, finding the notice sought to condition the release of the funds on the return of the balance of the deposit and its refusal to pay postjudgment attorney fees. The court found "interest on the judgment [would] cease on April 19, 2024," mistakenly stating this was "the date of the . . . order setting forth the amount of deposited funds to disburse to [Maas]." The court calculated the amount owed on the judgment, including

---

10      Statutory references are to the Code of Civil Procedure unless otherwise specified.

36

attorney fees and interest, as $4,570,453.79, and awarded an additional $51,172.50 in postjudgment fees to Maas.

The court also held it would retain the balance of MBC's deposit pending Maas's appeal, stating:

> "The Court disagrees with [MBC] that a potential award of a lodestar multiplier for [Maas's] previous motion for attorneys' fees and costs (if [Maas] prevails on appeal) is a separate judgment. Although an award of [Maas's] attorneys' fees and costs incurred in bringing her appeal would constitute a separate judgment (*Lucky United Properties Inv., Inc. v. Lee* (2010) 185 Cal.App.4th 125, 138), the relief afforded to [Maas] in awarding a lodestar multiplier on the original fees motion would constitute part of the original judgment."

1.    *Interest*

Section 685.030, subdivision (b), provides, "If a money judgment is satisfied in full . . . interest ceases to accrue on the date the judgment is satisfied in full."  A judgment is satisfied in full on the earliest of several enumerated dates, including "[t]he date satisfaction is tendered to the judgment creditor or deposited in court for the judgment creditor."  (*Id.*, subd. (d)(2).)

The trial court erred in determining the date of interest cessation. MBC's February 14, 2024, notice made "the $6,331,910.15 on deposit with the Court available to [Maas] to the extent needed to satisfy the Judgment." MBC had already "deposited" the funds with the court.  It thus satisfied the plain language of the statute, and the funds were "deposited in court for the judgment creditor" as of February 14, 2024.

The trial court found this notice was not sufficient to satisfy section 685.030 because MBC disclaimed Maas's postjudgment fees and sought the return of the rest of its deposit.  The notice purports to "reserve[]

37

[MBC's] right to obtain disbursement of all funds on deposit with the Court in excess all of the amount needed to satisfy the Judgment," but this is a reservation of rights with respect to funds *not* needed to satisfy the judgment, not a condition on the release of funds.

We also fail to see how MBC's refusal to pay additional postjudgment fees constituted a condition on the release of funds to satisfy the judgment. MBC (incorrectly) took the position its notice also cut off Maas's right to seek additional attorney fees under section 685.080, subdivision (a). But whether Maas could withdraw the funds and still seek postjudgment fees under section 685.080 is separate from whether MBC had satisfied the judgment for purposes of section 685.030. (See *Wertheim LLC v. Currency Corp.* (2019) 35 Cal.App.5th 1124, 1134 ["[S]atisfaction of a judgment for purposes of interest cessation does not satisfy the judgment for all purposes. In the context of a postjudgment motion for costs, the judgment is not satisfied until the judgment creditor has been paid."].) Moreover, section 685.080 is not a "condition" imposed *by MBC*, but the normal operation of interrelated statutes. Indeed, it is an intended consequence of these statutes that MBC was able to protect itself from the further accrual of interest by depositing the funds in accordance with section 685.030, while Maas was able to protect her ability to seek additional fees under section 685.080 by refusing to accept the funds. (See *Wertheim*, at p. 1134.)

In short, the notice was sufficient to stop interest accrual under section 685.030. On remand, the court shall recalculate interest owed on the judgment with a cessation date of February 14, 2024.

2. *Retention of the Deposit*

MBC argues the trial court should not have retained the balance of the deposit and asks us to order the trial court to "release all MBC funds on

deposit with the Superior Court, including all accrued interest." We have some concerns regarding the trial court's retention of MBC's deposit. MBC tendered a deposit to the court to stay enforcement of the judgment. That was no longer a live concern once the full amount of the judgment was released to Maas. And neither the trial court nor Maas has identified any authority for the court's retention of the deposit to secure funds in the event of Maas's victory on her appeal.

Nonetheless, this issue is mooted by our resolution of the consolidated appeals. Whether or not the trial court *should have* retained MBC's deposit is now legally irrelevant. The trial court retained the deposit because it reasoned "the relief afforded to [Maas] in awarding a lodestar multiplier on the original fees motion would constitute part of the original judgment." We have determined Maas is not entitled to a multiplier on her attorney fee award. Therefore, the trial court will release the balance of MBC's deposit on remand. Because our opinion cannot provide any effective relief, the issue is moot, and we will not decide it. (See, e.g., *Ebensteiner Co., Inc. v. Chadmar Group* (2006) 143 Cal.App.4th 1174, 1178.)

## IV.   DISPOSITION

With respect to appeal No. D082767, the judgment is affirmed. Maas is entitled to recover costs incurred in connection with MBC's appeal, and MBC is entitled to its costs in connection with Maas's cross-appeal.

With respect to appeal No. D084334, on remand, the trial court is directed to recalculate interest on the judgment with a cessation date of February 14, 2024.  The parties are to bear their own costs in connection with this appeal.

RUBIN, J.

WE CONCUR:


McCONNELL, P. J.


KELETY, J.